RZ/SJ:WC/FTB
F. #2013R01395

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA             **TO BE FILED UNDER SEAL**

    - against -                      COMPLAINT AND AFFIDAVIT IN
                                     SUPPORT OF APPLICATION FOR
SYED IMRAN AHMED, M.D.,               ARREST AND SEARCH WARRANTS

          Defendant

- - - - - - - - - - - - - - - X

IN THE MATTER OF AN APPLICATION
OF THE UNITED STATES OF AMERICA
FOR SEARCH WARRANTS FOR THE
PREMISES KNOWN AND DESCRIBED AS

1651 GRAND AVENUE, BALDWIN, NEW
YORK AND ALL LOCKED AND CLOSED
CABINETS FOUND THREIN ("SUBJECT
PREMISES No. 1")

and

1135 EASTERN PARKWAY, BROOKLYN, NEW
YORK AND ALL LOCKED AND CLOSED
CABINETS FOUND THEREIN ("SUBJECT
PREMISES No. 2")

- - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

        Jason Villecco, being first duly sworn, hereby deposes and

states that he is a Special Agent with the United States Department

of Health and Human Services, Office of Inspector General

("HHS-OIG"), duly appointed and acting as such.

1

In or about and between January 2011 and continuing to the present, within the Eastern District of New York and elsewhere, the defendant SYED IMRAN AHMED, M.D. did knowingly and willfully execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in Title 18, United States Code, Section 24(b), that is, Medicare, and did obtain and attempt to obtain by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, said health care benefit program, in connection with the delivery of and payment for health care benefits, items, and services.

(Title 18, United States Code, Section 1347)

Upon information and belief, there is probable cause to believe that there is located in 1651 GRAND AVENUE, BALDWIN, NEW YORK AND ALL LOCKED AND CLOSED CABINETS FOUND THEREIN ("SUBJECT PREMISES No. 1") and 1135 EASTERN PARKWAY, BROOKLYN, NEW YORK AND ALL LOCKED AND CLOSED CABINETS THEREIN ("SUBJECT PREMISES NO. 2") (collectively, the "SUBJECT PREMISES") evidence, fruits, and/or instrumentalities of health care fraud and attempted health care fraud in violation of 18 U.S.C. § 1347.

The basis of your deponent's information and the grounds for his belief are as follows:

2

1.   I have been a Special Agent with HHS-OIG for approximately four years.  I am currently assigned to investigate fraud involving federal health care programs, including schemes to defraud Medicare and Medicaid.  During my tenure at HHS-OIG, I have participated in a variety of criminal health care fraud investigations, during the course of which I have interviewed witnesses; conducted physical surveillance; executed search warrants; and reviewed Medicare claims data, bank records, phone records, Medicare beneficiaries' medical records, invoices, and other business records.  I am familiar with the records and documents maintained by health care providers and the laws and regulations related to administration of the Medicare program.  Through my training, education, and experience, I am familiar with the techniques and methods of operation used by individuals involved in criminal health care fraud to conceal their activities from detection from law enforcement authorities.

2.   Among other duties, I am currently participating in an investigation of violations of, among other things, 18 U.S.C. § 1347 (Health Care Fraud) by SYED IMRAN AHMED, M.D. ("AHMED"). Specifically, the investigation is focused on a scheme involving the fraudulent submission of claims for reimbursement to Medicare for health care services that were not in fact provided.

3

3.   I make this Affidavit in support of an application for an arrest warrant for AHMED and for search warrants to search the SUBJECT PREMISES, as more fully described in Attachment A.  Based on the facts set forth in this Affidavit, I respectfully submit that there is probable cause to believe that there presently is located in the SUBJECT PREMISES certain items and property, which are more fully set forth in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 1347.

4.   I am familiar with the investigation described in part below through analysis of reports submitted by other law enforcement personnel, including Special Agents with the Federal Bureau of Investigation ("FBI").  The facts and information contained in this Affidavit are based upon my own participation in the investigation; discussions with other federal law enforcement officers; records discovered in the course of this investigation that have been reviewed by myself and other law enforcement officers; my training and experience; and interviews with various individuals, including Medicare beneficiaries and AHMED himself.

5.   Because this Affidavit is being submitted for the limited purpose of seeking an arrest warrant and search warrants, I have not set forth each and every fact learned during the course of this investigation, but simply those facts that I believe are necessary to establish probable cause to support issuance of the

warrants.   Except where otherwise noted, all conversations and documents described in this Affidavit are set forth in part and in substance only.

## THE DEFENDAND AND THE SUBJECT PREMISES

6.    The defendant AHMED is a medical doctor licensed to practice in the state of New York.   AHMED is a surgeon specializing in general surgery and weight-loss surgeries.   AHMED resides in Glen Head, New York.

7.    AHMED maintains an office where he sees patients that is located at 1651 GRAND AVENUE, BALDWIN, NEW YORK (SUBJECT PREMISES No. 1).   Special Agents with HHS-OIG conducted surveillance of SUBJECT PREMISES No. 1 on November 8, 2013; February 24, 2014; and March 19, 2014.   The office is in a one-story building with a brick façade.   The office has a large window with a neon sign at the front of the building; the front door is on the right as one looks at the office from Grand Avenue.   A photograph of the front of the office is attached as Exhibit 1.   On March 20, 2014, I placed a phone call to the number printed on the awning of SUBJECT PREMISES No. 1 and inquired as to AHMED's availability for consultations the following week (the week of March 24, 2014).   I was told by an individual who answered the phone that AHMED kept office hours at SUBJECT PREMISES No. 1 from 9:30am to 11:00am on Fridays and would be available the week of March 24, 2014.

8.   AHMED also practices at another location at 1135 EASTERN PARKWAY, BROOKLYN, NEW YORK (SUBJECT PREMISES NO. 2).  The building at that address is two stories, with the entrance located on the right side of the first story.  The entrance has a red awning that is labeled "Doctor's Office."  The rest of the first story is occupied by a pharmacy that has a separate entrance.  The second story of the building has a large red sign that identifies it as the "Utica Medical Center" and gives a phone number.  Agents conducted surveillance of SUBJECT PREMISES No. 2 on February 20, 2014 and March 4, 2014.  When I spoke with the individual who answered my call to the number printed on SUBJECT PREMISES No. 1 on March 20, 2014, she also told me that AHMED was available for consultations at SUBJECT PREMISES No. 2 from 9:30am to 11:00am on Tuesdays and would be available the week of March 24, 2014.  Pictures of SUBJECT PREMISES No. 2 are attached hereto as Exhibit 2.

## BACKGROUND

9.   The Medicare Program ("Medicare") is a federal health care program providing benefits to persons aged 65 or older and to certain disabled persons.  Medicare is administered by the Centers for Medicare & Medicaid Services, a federal agency under the United States Department of Health and Human Services.  Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries."

6

10.   Medicare is a "health care benefit program," as defined by 18 U.S.C. § 24(b).

11.   Medical providers certified to participate in Medicare are assigned a provider transaction access number ("PTAN") for billing purposes.  After a medical provider renders a service to a beneficiary, the provider uses the applicable PTAN, along with other information, when submitting a claim for reimbursement to the Medicare contractor or carrier assigned to the provider's state. National Government Services, Inc. ("NGS") is the Medicare contractor responsible for administering the program in New York.

12.   To receive reimbursement for a covered service from Medicare, a medical provider is required to submit a claim either electronically or in writing.  The claim has to include, among other things, information identifying the provider, the rendering physician, the patient, the services rendered, the diagnosis or nature of the illness or condition treated, and the date or dates of service.  The claim identifies the procedure or service performed by reference to current procedural terminology codes ("CPT Codes") contained in the Healthcare Common Procedure Coding System book published by the American Medical Association.

13.   Medicare will reimburse providers for surgical procedures performed on beneficiaries, including the following procedures (among others) relevant to this investigation:

| CPT Code | Description of Procedure |
|---|---|
| 11005 | Removal of infected skin, muscle, or tissue of abdomen |
| 21501 | Incision and drainage of abscess or blood accumulation in soft tissues of neck or chest |
| 22015 | Drainage of abscess of lower spine or sacrum |
| 26990 | Drainage of abscess or blood accumulation in pelvis or hip joint |
| 27030 | Incision of hip joint with drainage |
| 27301 | Drainage of abscess or blood collection at thigh or knee region |
| 27603 | Drainage of abscess or blood collection at lower leg or ankle |
| 27604 | Drainage of infected fluid-filled sac (bursa) of leg or ankle |
| 28001 | Drainage of fluid-filled sac (bursa) of foot |
| 28002 | Drainage of fluid-filled sac (bursa) of foot – below fascia |
| 28003 | Drainage of multiple fluid-filled sacs (bursa) of foot |

14.    In submitting a claim to Medicare for these and other procedures, a health care provider certifies, among other things, that the services were actually rendered to the patient and that the services were medically necessary.

15.    In certain circumstances, a provider may be entitled to additional reimbursement funds if a particular surgical procedure was performed in connection with an unplanned, return trip to an operating room associated with complications stemming from a prior procedure.  Providers can indicate that a particular surgical procedure was performed as part of an unplanned, return trip to the operating room by referencing a modifier code ("78") when submitting

a claim for the procedure.  If a provider uses the "78" modifier to accompany a CPT Code, the provider is informing Medicare that the procedure indicated by the CPT Code was performed as part of an unplanned, return trip to an operating room.

### FACTS SUPPORTING PROBABLE CAUSE

16.   Under 18 U.S.C. § 1347, it is illegal to knowingly and willfully execute and attempt to execute a scheme and artifice to defraud Medicare and to obtain and attempt to obtain by means of false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of, Medicare in connection with the delivery of and payment for health care benefits, items, and services.  There is probable cause to believe that AHMED has engaged in violations of 18 U.S.C. § 1347 (Health Care Fraud).  Specifically, there is probable cause to believe that AHMED, a doctor practicing in Brooklyn and Long Island, New York, is engaged in a scheme to submit claims for reimbursement to Medicare for surgical procedures that were either not performed at all, or not performed in an operating room (when billed as if they had been), or both.

### Medicare Provider Enrollment Applications and Bank Account Information

17.   According to Medicare enrollment documents bearing a signature for AHMED, AHMED is a medical doctor specializing in

general surgery.   He is licensed to practice medicine in the state of New York.   The enrollment documents indicate that he has practiced at a number of different locations in Brooklyn and Long Island, New York; that he is affiliated with at least two health-care-related corporations in New York; and that he has at various times reassigned his Medicare benefits to other health care entities.   The enrollment documents indicate that AHMED has in the past identified 1651 GRAND AVENUE, BALDWIN, NEW YORK (SUBJECT PREMISES No. 1) and 1135 EASTERN PARKWAY, BROOKLYN, NEW YORK (SUBJECT PREMISES No. 2) as locations at which he practices medicine.

18.   The enrollment documents indicate that on at least two occasions AHMED has identified MED TECH SOLUTIONS ("MED TECH") as a company located in Michigan that he has retained to bill Medicare for services rendered by him.   SYED REHAN AHMED ("REHAN") (AHMED's brother) is identified in the enrollment documents each time as a contact person for MED TECH.

19.   Bank records obtained from TD Bank show AHMED as a signatory on a checking account in his name that he opened on February 18, 2008.   The account number for the account ends in 5668 (the "5668 Account").   Records and account statements for the 5668 Account have been obtained from TD Bank and reviewed by Special Agents for the FBI.   That review shows numerous electronic deposits into the account from NGS (on behalf of Medicare).

10

**Patient Complaints**

20.   Special Agents with HHS-OIG have conducted interviews of two Medicare beneficiaries.  One of the beneficiaries had called Medicare to register a complaint concerning AHMED, and the other beneficiary's daughter had made a complaint on her mother's behalf regarding AHMED.  In each instance, the complaint was that the beneficiary had been sent a document from Medicare indicating that they had received health care services performed by AHMED that had not in fact been performed.  The documents in question are generally referred to as "explanation-of-benefits" forms, and they are provided to beneficiaries to show which services and procedures have been billed to Medicare as having been performed by particular providers for the beneficiaries.

Patient No. 1

21.   Patient No. 1 is a female Medicare beneficiary, who has been identified in claims submitted for reimbursement to Medicare as someone for whom AHMED had rendered health care services in November 2012 ("Patient No. 1").  After receiving an explanation-of-benefits form, Patient No. 1's daughter had called Medicare to complain that her mother had not received some of the services that had been billed as having been performed by AHMED.

22.   According to the submitted claims, AHMED rendered the following services and performed the following procedures for

11

Patient No. 1 in November 2012: on November 2, 2012, an initial visit and evaluation (CPT Code 99223); on November 3, 2012, another visit and evaluation (CPT Code 99223); on November 4, 2012, drainage of abscess of lower spine or sacrum (CPT Code 22015) and drainage of abscess or blood collection at thigh or knee region (CPT Code 27301); and on November 5, 2012, drainage of abscess of lower spine or sacrum (CPT Code 22015).   The two CPT Code 22015 procedures were both billed with the "78" modifier, indicating that they occurred as part of an unplanned, return trip to the operating room.

      23.   Patient No. 1's daughter was interviewed in December 2013 and January 2014.   During the interviews, Patient No. 1's daughter said the following in substance and in part:

      a.   She generally handles her mother's affairs and in particular handles matters relating to her mother's health insurance coverage.   Patient No. 1's daughter lives with her mother and has power of attorney for her mother.

      b.   In November 2012, Patient No. 1 was taken from her residence to the emergency room at Hospital A with stomach pain. She was seen in the emergency room by AHMED.   Patient No. 1 remained in Hospital A for several days.   During this time, Patient No. 1 was seen again by AHMED, and Patient No. 1's daughter had discussions with AHMED regarding her mother's condition and visited her mother in Hospital A on multiple occasions.

12

c.    It was ultimately determined that Patient No. 1 needed surgery.  Patient No. 1 was transferred to another hospital where the surgery was performed (not by AHMED).  During the course of her stay in Hospital A, Patient No. 1 underwent multiple examinations, but did not have any surgical procedures performed on her.  Patient No. 1 had no wounds of any kind that required treatment during her stay in Hospital A.

d.    Upon receiving an explanation-of-benefits form from Medicare indicating that Medicare had been billed for drainage procedures performed by AHMED during Patient No. 1's time in Hospital A in November 2012, Patient No. 1's daughter called Medicare to complain that these procedures had not been performed on her mother.

24.   Patient No. 1 was interviewed by a Special Agent with HHS-OIG in January 2014.  During the interview, Patient No. 1 said in substance and in part the following:

a.    She had been hospitalized at Hospital A in November 2012 for stomach pain.  She was treated by AHMED, among others, during the course of her time there.

b.    It was ultimately determined that she needed surgery, and she was transferred to another hospital where the surgery was performed (not by AHMED).

c.    During the course of her stay in Hospital A, Patient No. 1 did not have any surgical procedures of any kind

13

performed on her.  She had no wounds and no blisters that required treatment while she was in the hospital.  She did undergo various examinations, but no incisions were made to her skin during her time at Hospital A in November 2012.  To her knowledge, at no time during her stay at Hospital A in November 2012 was she moved to an operating room.

25.  The claims data indicates that Medicare was billed approximately $18,000 for the drainage procedures performed by AHMED on Patient No. 1 and that Medicare paid out at least initially approximately $1,600 in reimbursement of those claims (the amount has since been adjusted downward in light of the complaint made by Patient No. 1's daughter).  Bank records for the 5668 Account were obtained from TD Bank and reviewed by Special Agents with the FBI. That review shows an electronic deposit to the 5668 Account from NGS of $2,297,869.63 on July 16, 2013.  A review of records from NGS shows that $1,587.86 of that payment was for the drainage procedures purportedly performed by AHMED on Patient No. 1.

Patient No. 2

26.  In September 2013, Special Agents with HHS-OIG conducted interviews of a female Medicare beneficiary, who had been identified in claims submitted for reimbursement to Medicare as someone for whom AHMED had rendered health care services ("Patient No. 2").  Patient No. 2 had called Medicare to complain that she had

14

received an explanation-of-benefits form from Medicare indicating that she had received services from AHMED that she had not in fact received.

27.  Claims for reimbursement were submitted to Medicare for procedures purportedly performed by AHMED on Patient No. 2 on each day from January 5 through 8, 2013 and January 10 through 11, 2013.  On each day of January 5 through 8, 2013 the claims indicate that AHMED performed three procedures on Patient No. 2: (1) drainage of abscess of lower spine or sacrum (CPT Code 22015); (2) drainage of abscess or blood collection at thigh or knee region (CPT Code 27301); and (3) drainage of abscess or blood collection at lower leg or ankle (CPT Code 27603).  On each of January 10 and 11, 2013, the claims indicate that AHMED performed five procedures on Patient No. 2: (1) drainage of abscess of lower spine or sacrum (CPT Code 22015); (2) drainage of abscess or blood collection at thigh or knee region (CPT Code 27301); (3) drainage of abscess or blood collection at lower leg or ankle (CPT Code 27603); (4) drainage of fluid-filled sac (bursa) of foot (right foot) (CPT Code 28001); and (5) drainage of fluid-filled sac (bursa) of foot (left foot) (also CPT Code 28001). Each of the services purportedly provided by AHMED is accompanied by a "78" modifier in the claims data, indicating an unplanned, return visit to the operating room for the procedure.

28.   Patient No. 2 said the following in substance and in part during the course of the interviews:

a.   She had been taken from her primary care doctor's office to the emergency room at Hospital A on January 1, 2013.  She stayed at Hospital A from January 1 through January 11, 2013, and she was treated there for dehydration and colitis.

b.   During her stay at Hospital A, Patient No. 2 did not have any kind of wound that required any surgical treatment and had no surgical procedures performed on her whatsoever.  Patient No. 2 received no treatment from AHMED and did not recall ever having met AHMED.  After receiving an explanation-of-benefits document from Medicare indicating that procedures had been performed on her during her stay in Hospital A by AHMED, Patient No. 2 called Medicare to complain that the procedures had not taken place.

29.   In total, Medicare was billed approximately $100,000 for the procedures purportedly performed by AHMED in January 2013 on Patient No. 2 and paid out at least initially approximately $9,200 in reimbursement for them (that amount has since been adjusted downward in light of Patient No. 2's complaint).  Bank statements show an electronic deposit from NGS into the 5668 Account on July 16, 2013 in the amount of $2,297,869.63.  A review of records from NGS shows that $9,230.64 of this figure represented payment for claims related to Patient No. 2.

16

### Additional Patient Interview

30.   A male Medicare beneficiary was identified in claims submitted for reimbursement to Medicare as someone for whom AHMED had rendered health care services ("Patient No. 3").  Claims were submitted to Medicare for procedures purportedly performed by AHMED on Patient No. 3 on each of the following dates: January 8 and 28, 2013; and February 5, 12, and 19, 2013.  According to the submitted claims, AHMED performed three procedures on Patient No. 3 on January 8, 2013: drainage of abscess or blood accumulation in pelvis or hip joint (right side) (CPT Code 26990); drainage of abscess or blood accumulation in the pelvis or hip joint (left side) (also CPT Code 26990); and drainage of abscess or blood collection at thigh or knee region (CPT Code 27301).

31.   The claims indicate that AHMED performed six procedures on Patient No. 3 on January 28, 2013 with the procedures being identified by the following CPT Codes: 45300; 45905; 46080; 46260; 46275; and 46940.

32.   According to the claims data, AHMED performed three procedures on Patient No. 3 on each of February 5, 12, and 19, 2013: drainage of abscess or blood accumulation in pelvis or hip joint (right side) (CPT Code 26990); drainage of abscess or blood accumulation in the pelvis or hip joint (left side) (also CPT Code 26990); and drainage of abscess or blood collection at thigh or knee

17

region (CPT Code 27301).  With one exception (the 27301 procedure on February 12, 2013), each of the procedures on February 5, 12, and 19, 2013 were billed with the "78" modifier, indicating that the procedures were performed as part of an unplanned, return trip to the operating room.

33.  Patient No. 3 was interviewed by law enforcement officers in October, November, and December 2013.  During the course of these interviews, Patient No. 3 said the following in substance and in part:

a.  In January 2013, Patient No. 3 was experiencing stomach pain.  He went to see a gastroenterologist, who referred him to AHMED.  Patient No. 3 saw AHMED for an initial visit at an office located at 1135 EASTERN PARKWAY, BROOKLYN, NEW YORK (SUBJECT PREMISES No. 2).  During that visit, AHMED diagnosed Patient No. 3 as needing surgery, which was scheduled for mid-January 2013 at Hospital B in Brooklyn, New York.

b.  Patient No. 3 went to Hospital B to have the surgery on the scheduled date.  He was put under general anesthesia in connection with the procedure, but he did not stay the night at the hospital.

c.  After the surgery, Patient No. 3 returned several times to the office at 1135 EASTERN PARKWAY, BROOKLYN, NEW YORK for follow-up visits with AHMED.  During these visits, AHMED

18

examined Patient No. 3's wound from the surgery, but did not perform any additional surgical procedures of any kind.  Patient No. 3 did not receive any treatment on his feet or legs during either the initial or the follow-up visits.

34.  According to the claims data, which was reviewed by Special Agents for HHS-OIG, approximately $68,000 was billed to Medicare for services performed by AHMED for Patient No. 3.  The review indicates that approximately $58,000 of that total was for the incision-and-drainage procedures described above.  A review of bank records and records from NGS shows that an electronic deposit of $2,297,869.63 was made to the 5668 Account on July 16, 2013. Approximately $5,000 of this payment represented payment for claims related to Patient No. 3, with most of the money for the incision-and-drainage procedures described above.

### Review of Medical Records at Hospital C

35.  In September and November, 2013, Special Agents with HHS-OIG went to Hospital C and interviewed, among others, the Chairman of the Department of Surgery ("the Chair of Surgery"). AHMED had practiced at Hospital C at various times and was known to the Chair of Surgery.  In addition, the Special Agents obtained medical records that were in the possession of Hospital C for various patients for whom, based on the Medicare claims data, AHMED performed services during their stays at Hospital C.

36. In addition to the medical records for certain individual patients, the Special Agents also obtained and reviewed a hard copy excerpt of the operating room log from Hospital C. The log, which is maintained in an electronic database, is an accounting of all procedures performed in the operating room suite (which houses a total of four operating rooms) at Hospital C. The log is typically updated by the nurses assisting doctors in performing procedures in an operating room. The log can be searched according to different criteria, including by the doctor who performed the procedures in an operating room and by date of procedure. The excerpt of the log that was reviewed was the result of a search conducted by hospital personnel for all log entries identifying AHMED as the doctor who performed the relevant procedure in an operating room at Hospital C during a time period from at least March 30, 2011 to at least April 9, 2012.

Patient No. 4

37. Claims for reimbursement were submitted to Medicare for services rendered by AHMED for Patient No. 4 from May 27 through June 1, 2011. The medical records relating to Patient No. 4's stays at Hospital C were among those that the HHS-OIG Special Agents obtained from Hospital C and reviewed. The records indicate that Patient No. 4 was admitted to Hospital C during the time when,

20

according to the submitted claims, services rendered by AHMED were performed for Patient No. 4.

38.   According to the submitted claims, AHMED performed four procedures on Patient No. 4 on each day from May 27 through June 1, 2011.   Specifically, the claims data indicates that on each day during that time period AHMED performed the following procedures on Patient No. 4: (1) drainage of abscess of lower spine or sacrum (CPT Code 22015); (2) drainage of abscess or blood collection at lower leg or ankle (CPT Code 27603); (3) drainage of multiple fluid-filled sacs (bursa) of foot (right foot) (CPT Code 28003); and (4) drainage of multiple fluid-filled sacs (bursa) of foot (left foot) (also CPT Code 28003).   Each of the claims for these procedures is accompanied by the "78" modifier indicating that the procedures were performed in connection with an unplanned, return visit to an operating room.

39.   The operating log shows no entries for any procedures performed by AHMED on Patient No. 4 at any time during the period queried; and, in particular, the log shows no entries for procedures performed by AHMED on Patient No. 4 on any of the days between May 27 and June 1, 2011.   According to the Chair of Surgery at Hospital C, the procedures identified by CPT Codes 22015, 27603, and 28003 are ones that would be performed in an operating room of Hospital C.   The Chair of Surgery said that, putting aside the operating room log, his own review of Patient No. 4's medical file showed a lack

21

of documentation that the Chair of Surgery would have expected to find had the procedures for which claims were submitted to Medicare been performed on Patient No. 4.

40. The claims data indicates that Medicare was billed approximately $125,000 for procedures performed by AHMED on Patient No. 4 during the time period specified above.  The claims data indicates that Medicare paid out approximately $10,000 in reimbursement for those claims.

Patient No. 5

41. Claims were submitted to Medicare for procedures performed by AHMED on Patient No. 5.  The medical records that were obtained from Hospital C included records for Patient No. 5's various stays there.  Those records show that Patient No. 5 was admitted to Hospital C during times when, according to the claims data, AHMED performed procedures on Patient No. 5.

42. The claims data indicates that AHMED performed two procedures on Patient No. 5 on each day from June 10 through June 13, 2011.  The claims data shows that AHMED, on each of those days, performed (1) a drainage of an abscess or blood collection at lower leg or ankle (CPT Code 27603); and (2) drainage of multiple fluid-filled sacs (bursa) of the foot (CPT Code 28003).  All but two of these procedures were accompanied by the "78" modifier, indicating an unplanned, return trip to an operating room.

43.   The claims data also indicates that AHMED performed multiple procedures on Patient No. 5 on many additional days.   The details of the claimed procedures are summarized in the following chart:

| Time Period | Procedures Performed on Patient No. 5 on Each Day During Time Period |
|---|---|
| 6/20/11 – 6/22/11; | • CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot)[1] – drainage of multiple fluid-filled sacs (bursa) of foot |
| 6/23/11 – 6/28/11; 7/4/11 – 7/7/11 | • CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filled sacs (bursa) of foot) |
| 7/8/11 – 7/12/11; 7/14/11 – 7/30/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filled sacs (bursa) of foot) |
| 7/31/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filled sacs (bursa) of foot |

---

[1] The claims data shows that AHMED performed only two procedures on June 21 and June 22, 2011 – the CPT Code 28003 procedure was only performed on the right foot on those days, according to the claims data.

23

| Time Period | Procedures Performed on Patient No. 5 on Each Day During Time Period |
|---|---|
| 8/1/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 27057 – Decompression fasciotomy, pelvic compartments with debridement of nonviable muscle<br>• CPT Code 27497 – decompression fasciotomy, thigh and/or knee, 1 compartment with debridement of nonviable muscle and/or nerve<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filled sacs (bursa) of foot |
| 8/2/11 – 8/3/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filed sacs (bursa) of foot |
| 8/4/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 31610 – tracheostomy, fenestration procedure with skin flaps<br>• CPT Code 60200 – excsision of cyst or adenoma of thyroid, or transaction of isthmus |

| Time Period | Procedures Performed on Patient No. 5 on Each Day During Time Period |
|---|---|
| 8/5/11 – 8/6/11; 8/8/11 – 8/9/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filled sacs (bursa) of foot |
| 8/12/11; 8/16/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 27301 – drainage of abscess or blood collection at thigh or knee region<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filled sacs (bursa) of foot |
| 8/18/11 – 8/23/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filled sacs (bursa) of foot |
| 8/24/11 – 9/6/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 27301 – drainage of abscess or blood collection at thigh or knee region<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filled sacs (bursa) of foot |

| Time Period | Procedures Performed on Patient No. 5 on Each Day During Time Period |
|---|---|
| 9/20/11 – 9/22/11; 9/24/11 – 9/26/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filled sacs (bursa) of foot |
| 9/27/11 – 10/13/11; 10-15/11 – 10/21/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 27301 – drainage of abscess or blood collection at thigh or knee region<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 (right foot) – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 28003 (left foot) – drainage of multiple fluid-filled sacs (bursa) of foot |

44.   In total, claims for over 480 procedures on Patient No. 5 performed during the period June 10, 2011 to October 21, 2011 were submitted to Medicare identifying AHMED as the rendering provider.[2]  The claims for all but 7 of these procedures were submitted with the "78" modifier indicating an unplanned, return trip to an operating room.  According to the operating room log from Hospital C, AHMED performed only four procedures on Patient No. 5 in an operating room during this time period: (1) an excisional debridement of multiple wounds on August 1, 2011; (2) a tracheostomy on August 4, 2011; (3) an excisional debridement and drainage of

---

[2] Sometimes multiple claims for the same procedure were initially submitted on the same day.

26

multiple wounds on August 19, 2011; and (4) an "excisional debridement sacral wounds bilateral feet" procedure on October 5, 2011.  The medical records for Patient No. 5 indicate that the patient was pronounced dead at Hospital C at approximately 2:36 pm on October 21, 2011.  According to the claims data, AHMED performed 6 surgical procedures on Patient No. 5 (in an operating room at Hospital C) on the day of his death.

45.  As noted above, the Chair of Surgery at Hospital C stated in substance and in part that the types of procedures identified in the claims data as having been performed on Patient No. 5 by AHMED are the kinds of procedures that would be performed in an operating room at Hospital C.  The Chair of Surgery also said that his own review of Patient No. 5's medical file showed (with the exception of the procedures listed in the operating room log) a lack of documentation that the Chair of Surgery would have expected to find had the procedures for which claims were submitted to Medicare been performed on Patient No. 5.

46.  The claims data indicates that Medicare was billed approximately $2.6 million for procedures performed by AHMED on Patient No. 5 during the timeframe specified above.  The claims data indicates that Medicare paid out approximately $232,000 in reimbursement for those claims.

27

Patient No. 6

47. Claims were submitted to Medicare for procedures performed by AHMED on Patient No. 6. The medical records that were obtained from Hospital C included records for Patient No. 6's various stays there. Those records show that Patient No. 6 was admitted to Hospital C during times when, according to the claims data, AHMED performed procedures on Patient No. 6.

48. The claims data shows procedures performed on Patient No. 6 by AHMED during the period April 1, 2011 through January 19, 2012. As with other patients, the claims data indicate that AHMED frequently performed multiple procedures on Patient No. 6 for days and sometimes weeks at a time. The procedures and services that, according to the claims data, were provided by AHMED to Patient No. 6 are detailed in the chart below:

| Time Period | Procedures Performed on Patient No. 6 on Each Day During Time Period |
|---|---|
| 4/1/11 | • CPT Code 99222 – initial hospital care for the evaluation and management of patient, including comprehensive patient history, comprehensive examination, and medical decision making of moderate complexity (typically 50 minutes in length) |
| 4/2/11 – 4/7/11 | • CPT Code 99232 – subsequent hospital care for the evaluation and management of patient (typically 25 minutes in length) |
| 5/20/11 | • CPT Code 49560 – repair initial incisional or ventral hernia<br>• CPT Code 44151 – colectomy, total, abdominal, without protectomy; with ileostomy or ileoproctostomy and with continent ileostomy<br>• CPT Code 49566 – used when 49560 procedure is "incarcerated or strangulated" |

| Time Period | Procedures Performed on Patient No. 6 on Each Day During Time Period |
|---|---|
| 5/21/11 | • CPT Code 44314 – Revision of ileostomy; simple (release of simple scar) – complicated (reconstruction in depth) |
| 5/24/11; 5/25/11 | • CPT Code 11005 – removal of infected skin, tissue, or muscle of abdomen |
| 5/30/11; 5/31/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 11005 – removal of infected skin, tissue, or muscle of abdomen |
| 6/2/11; 6/5/11- 6/8/11 | • CPT Code 11005 – removal of infected skin, tissue, or muscle of abdomen |
| 6/12/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 11005 – removal of infected skin, tissue, or muscle of abdomen |
| 6/13/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 43830- gastrostomy, open; without construction of gastric tube<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 11005 – removal of infected skin, tissue, or muscle of abdomen |
| 6/14/11 – 6/16/11; 6/21/11 – 6/28/11 | • CPT Code 22015[3] – drainage of abscess of lower spine or sacrum<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot<br>• CPT Code 11005 – removal of infected skin, tissue, or muscle of abdomen |

---

[3] Two of these procedures were billed on 6/24/11.

| Time Period | Procedures Performed on Patient No. 6 on Each Day During Time Period |
|---|---|
| 7/11/11 – 7/12/11; 7/14/11 – 8/6/11; 8/8/11; | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot (right)<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot (left)<br>• CPT Code 11005 – removal of infected skin, tissue, or muscle of abdomen |
| 9/7/11 – 9/14/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot (right)<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot (left)<br>• CPT Code 11005 – removal of infected skin, tissue, or muscle of abdomen |
| 9/15/11 – 9/19/11 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot (right)<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot (left) |
| 9/20/11; 9/26/11; 10/4/11 – 10/11/11; 11/3/11 – 11/11/11; 11/13/11 – 11/16/11; 11/18/11 – 11/30/11; 12/13/11 – 1/4/12; 1/19/12 | • CPT Code 22015 – drainage of abscess of lower spine or sacrum<br>• CPT Code 27603 – drainage of abscess or blood collection at lower leg or ankle<br>• CPT Code 27030 – incision of hip joint with drainage<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot (right)<br>• CPT Code 28003 – drainage of multiple fluid-filled sacs (bursa) of foot (left)<br>• CPT Code 11005 – removal of infected skin, tissue, or muscle of abdomen |

49.   In total, claims for over 640 services and procedures performed for Patient No. 6 during the period April 1, 2011 to January 19, 2012 were submitted to Medicare identifying AHMED as the rendering provider.[4]  All but 13 of these services and procedures were billed to Medicare using the "78" modifier indicating an unplanned, return trip to an operating room.  As noted above, according to the Chair of Surgery at Hospital C, the surgical procedures billed to Medicare for Patient No. 6 are the sort that would be performed in an operating room at Hospital C (with the possible exception of CPT Code 11005, which, depending on the circumstances, could conceivably be performed bedside).

50.   The operating room log from Hospital C shows one surgical procedure performed by AHMED on Patient No. 6 during the time period April 1, 2011 to January 19, 2012: a "subtotal colectomy/ileostomy/repair ventral hernia" on May 20, 2011.  The Chair of Surgery also said that his own review of Patient No. 6's medical file showed (with the exception of the procedure listed in the operating room log) a lack of documentation that the Chair of Surgery would have expected to find had the procedures for which claims were submitted to Medicare been performed on Patient No. 6 during the relevant time period.  According to the medical records,

---

[4] Sometimes multiple claims for the same procedure were initially submitted for the same day.

Patient No. 6 died at 1:26 a.m. on January 8, 2012. As noted above, claims were submitted to Medicare for six procedures performed on Patient No. 6 on January 19, 2012 by AHMED. Medicare did not pay any reimbursement for those claims.

51. Medicare was billed approximately $3.5 million for the procedures that, according to the claims data, were performed by AHMED on Patient No. 6 during the time period April 1, 2011 through January 19, 2012. Medicare paid out approximately $337,000 in reimbursement of claims submitted for these procedures. A review of bank statements and records from NGS shows that $105,613.94 was electronically deposited into the 5668 Account by NGS on January 6, 2012, with a portion of the total for claims based on procedures performed on Patient No. 6. Similar deposits were made on February 8, 2012 (total payment of $281,754.71, with a portion of the total for claims based on procedures performed on Patient No. 6) and February 14, 2012 (total payment of $299,654.94, with a portion of the total for claims based on procedures performed on Patient No. 6).

### 9/3/13 Interview of AHMED

52. On September 3, 2013, Special Agents with HHS-OIG interviewed AHMED at his residence in Glen Head, New York. During the interview, AHMED stated in substance and in part the following:

32

a.    AHMED is a general surgeon specializing in both weight loss surgeries and wound care.  He maintains a small, individual practice that has used offices in several different locations.  Presently, he has an office at 1651 GRAND AVENUE, BALDWIN, NEW YORK (SUBJECT PREMISES No. 1).

b.    AHMED has privileges at multiple hospitals in the New York area, including Hospitals A and B; AHMED formerly had privileges at Hospital C, but does not have privileges currently. AHMED is referred patients by other doctors and hospital emergency room staff who identify individuals in need of his services.  AHMED does rounds to check on his patients at the various hospitals at which he has privileges during the patients' stays there.

c.    The medical records for any health care services AHMED provided to patients in the various hospitals at which he has or had privileges would be maintained by the respective hospitals. The only medical records that AHMED himself maintains are kept at his office at 1651 GRAND AVENUE, BALDWIN, NEW YORK (SUBJECT PREMISES No. 1) and relate to services he provided at that location.

d.    AHMED uses a billing company that his brother REHAN started to submit claims to Medicare for services AHMED provided to Medicare beneficiaries and other patients.  AHMED identified the company as MED TECH, which he said operates out of Michigan.

33

e.   For a typical inpatient encounter, AHMED personally will send an annotated copy of the patient's hospital "face sheet" (a snapshot summary of a patient's stay in the hospital) to MED TECH in which he indicates which procedures he performed for the patients by reference to CPT Code.   AHMED typically mails hard copies of the annotated "face sheets" to MED TECH.   MED TECH will then submit claims to various insurance carriers, including Medicare, for the procedures and services performed by AHMED. Payment for the claims will then be made directly to AHMED by those carriers.   AHMED in turn pays MED TECH out of the funds that he receives as payment from the various insurance carriers.

f.   AHMED recalled only a few patient complaints over the years regarding billing for services performed by him that the patients did not recall receiving.   These complaints typically go to MED TECH in the first instance.   According to AHMED, patients sometimes only remember the surgeon who performs the initial procedure and not the doctors who provided treatment subsequently.

g.   Wound care treatment varies on a case-by-case basis.   AHMED's typical wound care treatment consists of moving the patient to expose the wound, draining the wound of puss, cleaning the affected area, packing the wound, and bandaging, if needed. Sometimes a slight incision is made to drain the wound properly.

34

These kinds of incisions are done bedside and are so minor that they might not be noticed by the patient.

### AHMED Medicare Claims History

53.  A review of data for claims submitted to Medicare shows that during the period January 1, 2011 to mid-December, 2013, Medicare was billed approximately $85 million for services rendered by AHMED and identified by the CPT Codes listed above in paragraph 13.  The review indicates that Medicare paid over $7 million in reimbursement for those claims.

54.  The review of the claims data also shows that claims for surgical procedures identifying AHMED as the rendering provider were submitted to Medicare in volumes significantly greater than claims identifying any other provider in the country as the rendering provider for the same type of procedures.  For example, a review of the claims data from a different time period (January 1, 2010 to July 19, 2013) shows that Medicare was billed approximately $25.2 million for procedures involving drainage of an abscess at the lower spine or sacrum (CPT Code 22015) with AHMED identified in the claims as the rendering provider.  The review shows that Medicare paid out approximately $2 million in reimbursement for these claims (as of July 19, 2013).  By comparison, the review indicates that the next highest amount Medicare was billed for these procedures (CPT Code 22015) performed during the same time period with any other provider

35

in the country identified as the rendering provider was approximately $163,000; the review shows that Medicare paid out approximately $13,600 in reimbursement of those claims (as of July 19, 2013).

### Post-Interview Wire Transfers by AHMED

55.  A review of bank records shows that on September 9, 2013, six days after AHMED was interviewed by HHS-OIG agents, two wire transfers – each for $1 million – were made from TD Bank accounts with AHMED as a signatory (one from the 5668 Account) to accounts in Pakistan.  AHMED is listed as the beneficiary of the wire transfers to the accounts in Pakistan, indicating that the accounts that received the funds are controlled at least in part by him.  In addition, AHMED wrote a check payable to himself for $1 million drawn upon the 5668 Account.  The check was later deposited into a new account opened with AHMED as a signatory at JP Morgan Chase.

56.  The review of bank records shows – based on available information – previous wire transfers from accounts with AHMED as a signatory to accounts located abroad, including to accounts that appear to be controlled at least in part by AHMED.  One such transfer was for $150,000 on December 13, 2012; this transfer was from a TD Bank account in the name of the "Syed Imran Ahmed Foundation, Inc." (it is unclear if this transfer was successful, as the bank records indicate that the majority of the transferred funds returned to the relevant account a few days later).  With the exception of this wire

36

transfer, most of the other wire transfers to accounts located abroad from accounts with AHMED as a signatory were for amounts of approximately $10,000 each.

57.   With the exception of the Syed Imran Ahmed Foundation account described above, at least 18 other wire transfers were made from accounts with AHMED as signatory to accounts located in Pakistan during the period January 25, 2011 to July 30, 2013.   The most that was sent abroad in any one of these previous transfers was approximately $34,000.   In total, these 18 transfers involved the movement of approximately $160,000.

**RELEVANT BUSINESS RECORDS**

58.   Based on my knowledge, training, and experience, as well as conversations with other law enforcement officers, I have knowledge of common business practices.   In particular, I am aware that businesses, including physician practices, routinely document and maintain records of their operating accounts – both in hard copy and electronically – including the receipt, expenditure and accounting of business funds.   Businesses also maintain detailed records of their business activities, including with respect to vendors, customers, lenders, and employees.   Based on this and the information described above, there is probable cause to believe that there will be located at each of the SUBJECT PREMISES business records

documenting interactions and communications regarding the fraudulent scheme.

59.  Based on my knowledge, training, and experience, businesses billing Medicare also routinely maintain records of patient files, bills, invoices, and claims for payments/reimbursements for services billed, provided, or alleged to have been provided.  Documents include reimbursement claim forms, explanations of medical benefits, detailed written orders or prescriptions, certificates of medical necessity, information from the treating physician concerning the patient's diagnosis, and proof of delivery of services or items that were submitted by physicians or individuals acting on their behalf.

60.  Based on my knowledge, training, and experience, businesses billing Medicare also retain letters relating to efforts to collect co-payments and deductibles from individuals that receive health care coverage from Medicare.  In addition, businesses retain correspondence and cancelled checks relating to notices of overpayment and requests for refunds from Medicare.  Businesses billing Medicare also typically have correspondence to and from Medicare, including, but not limited to, manuals, advisories, newsletters, bulletins, and publications.  Businesses also retain correspondence to and from patients regarding Medicare.

61.   Based on my knowledge, training, and experience, the financial books, records, and documents constituting bank accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds or bond funds, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, credit card, ATM, and debit card accounts are also retained by businesses.

62.   Based on my knowledge, training, and experience, contracts, agreements, logs, lists, or papers affiliated with any medical professional services, referrals, or storage, including records of payments are also retained by businesses.  In this case, information related to compensation provided to MED TECH by AHMED is also likely to be relevant to the alleged scheme, and, based on the information provided above, there is probable cause to be believe that this information will be found at each of the SUBJECT PREMISES.

## TECHNICAL BACKGROUND

63.   I know that when an individual uses a computer as part of a scheme to submit fraudulent billing information to Medicare, the individual's computer will generally serve both as an instrumentality for committing the crime, and also as a storage medium for evidence of the crime.  The computer is an instrumentality of the crime because it is used as a means of committing the acts that constitute the criminal offense.  The computer is also likely

39

to be a storage medium for evidence of crime.  From my training and experience, I believe that a computer used to commit a crime of this type may contain: data that is evidence of how the computer was used; data that was sent or received; notes as to how the criminal conduct was achieved; records of Internet discussions about the crime; and other records that indicate the nature of the offense.

64.  As described above and in Attachment B, this application seeks permission to search for records that might be found on any of the SUBJECT PREMISES, in whatever form they are found. One form in which the records are likely to be found, based on the information provided above, is data stored on a computer's hard drive or other storage media.  Thus, the warrant applied for would authorize the seizure of electronic storage media or, potentially, the copying of electronically stored information, all under Rule 41(e)(2)(B).

65.  I submit that if a computer or storage medium is found on the SUBJECT PREMISES, there is probable cause to believe that records will be stored on that computer[5] or storage medium,[6] for at least the following reasons:

---

[5] For purposes of the requested warrant, a computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, server computers, and network hardware, as well as wireless routers and other hardware involved in network and Internet data transfer.

a.    Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.    Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the storage medium that is not currently being used by an active file – for long periods of time before they are overwritten. In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.    Wholly apart from user-generated files, computer storage media – in particular, computers' internal hard drives - contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating

---

[6] A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded.  Examples include external hard drives, CDs and DVDs, and flash drives.

system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.   Computer users typically do not erase or delete this evidence, because special software is typically required for that task.   However, it is technically possible to delete this information.

d.   Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

66.  As further described in <u>Attachment B</u>, this application seeks permission to locate not only computer files that might serve as direct evidence of the crimes described on the warrant, but also electronic "attribution" evidence that establishes how computers were used, the purpose of their use, who used them, and when.   There is probable cause to believe that this forensic electronic evidence will be on any storage medium in any of the SUBJECT PREMISES because:

a.   Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently

active.  Web browsers, email programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created, although this information can later be falsified.

b.    Forensic evidence on a computer or storage medium can also indicate who has used or controlled the computer or storage medium.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.  For example, registry information, configuration files, user profiles, email, email address books, "chat," instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the computer or storage medium at a relevant time.

c.   A person with appropriate familiarity with how a computer works can, after examining this forensic evidence in its

43

proper context, draw conclusions about how computers were used, the purpose of their use, who used them, and when.

d.   The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.   Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.   Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a computer was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.   For example, the presence or absence of counter-forensic programs or anti-virus programs (and associated data) may be relevant to establishing the user's intent.

67.   In most cases, a thorough search of a premises for information that might be stored on computers or storage media often requires agents to seize physical storage media and later review the media consistent with the warrant.   In lieu of removing storage media from the premises, it is sometimes possible to make an image copy of storage media.   Generally speaking, imaging is the taking of a complete electronic picture of the computer's data, including all

44

hidden sectors and deleted files.   Either seizure or imaging is often necessary to ensure the accuracy and completeness of data recorded on the storage media, and to prevent the loss of the data either from accidental or intentional destruction.   This is true because of the following:

a.   The time required for an examination.   As noted above, not all evidence takes the form of documents and files that can be easily viewed on site.   Analyzing evidence of how a computer has been used, what it has been used for, and who has used it requires considerable time, and taking that much time on the SUBJECT PREMISES could be unreasonable.   As explained above, because the warrant calls for forensic electronic evidence, it is exceedingly likely that it will be necessary to thoroughly examine storage media to obtain evidence.   Storage media can store a large volume of information.   Reviewing that information for things described in the warrant can take weeks or months, depending on the volume of data stored, and would be impractical and invasive to attempt on-site.

b.   Technical requirements.   Computers can be configured in several different ways, featuring a variety of different operating systems, application software, and configurations.   Therefore, searching them sometimes requires tools or knowledge that might not be present on the search site.   The vast array of computer hardware and software available makes it difficult

45

to know before a search what tools or knowledge will be required to analyze the system and its data on the SUBJECT PREMISES.  However, taking the storage media off-site and reviewing it in a controlled environment will allow its examination with the proper tools and knowledge.

        c.   Variety of forms of electronic media.  Records sought under this warrant could be stored in a variety of storage media formats that may require off-site reviewing with specialized forensic tools.

        68.  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit seizing, imaging, or otherwise copying storage media that reasonably appear to contain some or all of the evidence described in the warrant, and would authorize a later review of the media or information consistent with the warrant.  The later review may require techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of a hard drive to human inspection in order to determine whether it is evidence described by the warrant.

        69.  I recognize that the SUBJECT PREMISES house functioning medical practices (the "Practices") with employees and that a seizure of the Practices' computers may have the unintended effect of limiting the Practices' ability to conduct

legitimate business.  As with any search warrant, I expect that officers executing this warrant will take appropriate steps to execute the warrant reasonably and avoid causing unnecessary inconvenience to the Practices, its employees, and its patients. Such steps may include:

a.   Identifying a system administrator of the network (or other knowledgeable employee) who would be willing to assist law enforcement by identifying, locating, and copying the things described in the warrant;  imaging items on-site, as described above; and,

b.   If imaging proves impractical, or even impossible for technical reasons, seizing those components of the Practices' computer system that are necessary to conduct an off-site examination.  The seized components would be removed from the SUBJECT PREMISES.  If employees of the Practices so request, the agents will, to the extent practicable, attempt to provide the employees with copies of data that may be necessary or important to the continuing function of the Practices' legitimate business.  If, after inspecting the computers, it is determined that some or all of this equipment is no longer necessary to retrieve and preserve the evidence, the government will return it within a reasonable time.

## CONCLUSION AND APPLICATION

70.   Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe that the defendant AHMED committed a crime.  Accordingly, an arrest warrant is requested.

71.   Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe that on the SUBJECT PREMISES there exists evidence of crimes – specifically, evidence of violations and attempted violations of 18 U.S.C. § 1347 (Health Care Fraud).  Accordingly, this Affiant respectfully requests that this Court issue a search warrant for the SUBJECT PREMISES, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, which constitute evidence, fruits, or instrumentalities of violations and attempted violations of 18 U.S.C. § 1347.

72.   It is respectfully requested that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including the application, arrest warrant, and search warrants.  I believe that sealing these documents is necessary because the items and information to be seized are relevant to an ongoing investigation, and that not all of the targets of this investigation will be searched at this time.  Based upon my training and experience, I have learned that criminals

48

actively search for criminal affidavits and search warrants via the Internet, and disseminate them to other criminals as they deem appropriate, e.g., by posting them publicly through online forums. Premature disclosure of the contents of this affidavit and related documents may have a significant and negative impact on the continuing investigation and may severely jeopardize its effectiveness.

WHEREFORE, your Affiant respectfully requests that the requested search warrants be issued for the SUBJECT PREMISES, and therein, to seize any and all books, records, documents and computers, all of which may constitute evidence, instrumentalities and fruits of violations of Title 18, United States Code, Section 1347.

WHEREFORE, your Affiant also respectfully requests that a warrant issue for the defendant AHMED so that he may be dealt with according to law.

IT IS FURTHER REQUESTED that all papers submitted in support of this application, including the application, search warrants, and arrest warrant, be sealed until further order of the

Court.

Dated:     Brooklyn, New York

                           _____
                           Jason Villecco
                           Special Agent
                           Office of Inspector General
                           U.S. Department of Health and Human
                           Services


Sworn to before me _____



_____
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

## ATTACHMENT A

### Property to be Searched

1651 GRAND AVENUE, BALDWIN, NEW YORK AND ALL LOCKED AND CLOSED CABINETS FOUND THEREIN ("SUBJECT PREMISES No. 1")

1135 EASTERN PARKWAY, BROOKLYN, NEW YORK AND ALL LOCKED AND CLOSED CABINETS THEREIN ("SUBJECT PREMISES NO. 2")

1

**ATTACHMENT B**

Property to be Seized

1.   All records relating to violations of Title 18, United States Code, Section 1347 from January 1, 2011 to the present and involving Syed Imran Ahmed, M.D., Syed Rehan Ahmed, and Med Tech Solutions, including, but not limited to:[1]

   a.   Documents constituting, concerning, or relating to patient files, bills, invoices, and claims for payment/reimbursement for services billed, provided, or alleged to have been provided to patients to include, but not limited to, reimbursement claim forms, explanations of medical benefits, dispensing orders, detailed written orders or prescriptions, certificates of medical necessity, information from physician(s) concerning the patients' diagnosis, superbills or "face sheets" indicating what procedures were performed for particular patients, and proof of delivery of services and/or items that were submitted by any representative acting on behalf of Syed I. Ahmed, M.D.

   b.   All contracts, agreements, papers, and affiliated

---

[1] For purposes of the requested warrant, the terms "records" and "information" include evidence of the specified crime(s) in whatever form and by whatever means it may have been created or stored, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing, drawing, or painting); any mechanical form (such as printing or typing); and any photographic form (such as videos, digital and print photographs, or photocopies).

1

records constituting, concerning, or relating to the providing of medical services by Syed I. Ahmed, M.D., or any representative acting on his behalf, to include, but not limited to, manufacturer catalogs, purchase orders, invoices, and receipts.

       c.   All letters constituting, concerning, or relating to efforts to collect co-payments and/or deductibles for individuals who may have received health care services from Syed I. Ahmed, M.D.

       d.   All correspondence and cancelled checks relating to notice of overpayment and request for refunds from Medicare or any other health insurance provider concerning Syed I. Ahmed, M.D.

       e.   All correspondence to and from Medicare or any other health insurance provider concerning Syed I. Ahmed, M.D., including, but not limited to, manuals, advisories, newsletters, bulletins, and publications.

       f.   All correspondence to and from patients who may have received health care services from Syed I. Ahmed, M.D.

       g.   Financial books and records and documents constituting, concerning, or relating to Syed I. Ahmed, M.D. or Syed Rehan Ahmed or Med Tech Solutions, including but not limited to:

       (1)   Bank Accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds or bond fund, including deposits and disbursements, cancelled checks or draft electronic

2

transfers, ledgers, loan statements, loan agreements; and

(2)   Credit card/ATM/debit card accounts.

h.   All contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals, or storage for Syed I. Ahmed, M.D., Syed Rehan Ahmed, or Med Tech Solutions, to include, but not limited to, records of payment by Syed I. Ahmed, M.D.

i.   All employee files and resumes relating to Syed I. Ahmed, M.D., Syed Rehan Ahmed, or Med Tech Solutions LLC.  This may include, but is not limited to, any handwritten or computer files listing any and all employee names addresses, telephone numbers, and background information for all current and former employees.

j.   All contracts, agreements or paper affiliated with any medical insurance billing company for Syed I. Ahmed, M.D.

2.   Computers [2] or storage media [3] that contain records or information (hereinafter "COMPUTERS") used as a means to commit violations of Title 18, United States Code, Section 1347.  All information obtained from such COMPUTERS will be maintained by the

---

[2] A computer includes all types of electronic, magnetic, optical, electrochemical, or other high speed data processing devices performing logical, arithmetic, or storage functions, including desktop computers, laptops, mobile phones, tablets, servers, and network hardware, such as wireless routers.

[3] A "storage medium" for purpose of the requested warrant is any physical object upon which computer data can be recorded.  Examples include external hard drives, CDs, DVDs and flash drives.

government for the purpose of authentication and any potential discovery obligations in any related prosecution.  The information shall be reviewed by the government only for the purpose of identifying and seizing information that constitutes fruits, evidence and instrumentalities of violations of Title 18 United States Code, Section 1347 involving Syed Imran Ahmed, Syed Rehan Ahmed, or Med Tech Solutions, LLC, including:

a.   evidence of who used, owned, or controlled the COMPUTERS at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, instant messaging logs, photographs, and correspondence;

b.   evidence of software that would allow others to control the COMPUTERS, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.   evidence of the lack of such malicious software;

d.   evidence of the attachment to the COMPUTERS of other storage devices or similar containers for electronic evidence;

e.   evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the COMPUTER;

4

       f.    evidence of the times the COMPUTERS were used;

       g.    passwords, encryption keys, and other access devices that may be necessary to access the COMPUTERS;

       h.    documentation and manuals that may be necessary to access the COMPUTERS or to conduct a forensic examination of the COMPUTERS; and

       i.    contextual information necessary to understand the evidence described in this Attachment;

all of which constitute evidence, fruits, and instrumentalities of violations of Title 18, United States Code, Section 1347.

5

## Exhibit 1

Picture of front of 1651 Grand Avenue, Baldwin, New York



## Exhibit 2

Pictures of front of 1135 Eastern Parkway, Brooklyn, New York

